THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ALBERT VANDEWATER, Appellant.

84

(Argued October 8, 1928; decided December 31, 1928.)

*Thomas R. Fay, George A. Gibson* and *George E. Mulry* for appellant. The conviction is based solely upon the alleged maintenance of premises for the sale of intoxicating liquor in violation of the National Prohibition Act and should, therefore, be reversed and the indictment dismissed. (*People* v. *Cook*, 220 App. Div. 110; 248 N. Y. 597.) The defendant is not guilty of keeping a disorderly house and maintaining a public nuisance as defined in sections 1146 and 1530 of the Penal Law, since the alleged sale of liquor to persons within doors, unobserved by the public and unaccompanied by noise, violence and unseemly conduct, does not offend public decency. (*People* v. *Haber,* 221 App. Div. 150; *Boliver* v. *Monnat,* 130 Misc. Rep. 660; *People* v. *Conti,* 127 Misc. Rep. 244; *People* v. *Wade,* 126 Misc. Rep. 574; 127 Misc. Rep. 593; *People* v. *Barberi,* 127 Misc. Rep. 864; *People* v. *Eckerson,* 133 App. Div. 220.)

*Elvin N. Edwards, District Attorney* (*Philip Huntington* of counsel), for respondent. The sale of intoxicating liquor is an unlawful act within the meaning of section 1530 of the Penal Law. (*People* v. *Otis,* 235 N. Y. 421; *People* v. *Heff,* 110 Misc. Rep. 76; *People* v. *Borden Condensed Milk Co.,* 165 App. Div. 711; *People* v. *High*

*Ground Dairy Co.,* 166 App. Div. 81.) The maintenance of premises for the unlawful sale of intoxicating liquors offends public decency. (*Bohan* v. *Port Jervis Gas-Light Co.,* 122 N. Y. 32.) A "speak-easy" is in fact and in every sense of the word a public nuisance. (*People* v. *Jones,* 129 App. Div. 772; 195 N. Y. 547; *People* v. *Doris,* 14 App. Div. 117; *Hamlin* v. *Bender,* 92 Misc. Rep. 16; *People* v. *Borden Condensed Milk Co.,* 165 App. Div. 711; 216 N. Y. 658; *People* v. *High Ground Dairy Co.,* 166 App. Div. 81; *United States* v. *Sumner,* 125 Misc. Rep. 658; 216 App. Div. 782; *People* v. *Curtis,* 152 App. Div. 372; 206 N. Y. 707.) A house or like place for the habitual commission of illegal acts is a disorderly house and a public nuisance under the common law. (*People* v. *Hoffman,* 118 App. Div. 862; 189 N. Y. 561.)

LEHMAN, J. The defendant maintained, in the village of Hempstead in Nassau county, a room where he sold intoxicating liquor. The room was in the rear of a store and there was nothing in the appearance of the store which gave notice of the nature of the traffic conducted in the rear or which might be regarded as an invitation to the general public to enter the premises and regale themselves. In other days it has been said that "good wine needs no bush," and it appears from the evidence that even without any signs or public invitation, customers found their way to the place where they could obtain from the defendant the prohibited but enticing beverage. The beverage was served to them in surroundings which, we are advised, would not be unfamiliar to those who habitually visited saloons when the traffic in liquor might be sanctioned and regulated by governmental authority. There was a counter described as a "bar." Bottles were displayed, some purporting to contain innocent "ginger ale;" others purporting to contain more potent fluids. There were small tables and chairs in front of the counter or "bar" and a witness

testified that he saw men at these tables in an intoxicated condition, and men in similar condition at times emerged from the premises. The defendant's premises were near a school and immediately adjacent to a confectionery and ice-cream shop to which school children came during the lunch hour.

The defendant has been convicted of maintaining an ill-governed and disorderly house and a public nuisance. Section 1530 of the Penal Law provides that "a public nuisance" is a crime against the order and economy of the State and consists in unlawfully doing an act or omitting to perform a duty, which act or omission: " 1. Annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons; or, 2. Offends public decency; or, 3. * * * or, 4. In any way renders a considerable number of persons insecure in life, or the use of property." It is, of course, not disputed that each sale of intoxicating liquor by the defendant constitutes a criminal offense under the National Prohibition Act, and that within the definition contained in that act the defendant maintained a public nuisance. An act prohibited by the National Prohibition Act constitutes an offense against the United States, it constitutes no offense against the peace and dignity of the State. ( *United States* v. *Lanza,* 260 U. S. 377.) The defendant has been charged with a crime against the " order and economy of the State." The charge may be sustained only by proof which brings defendant's offense within the definition of a " public nuisance " contained in section 1530 of the Penal Law. Proof which shows only that an accused has on a certain day committed an offense under the National Prohibition Act by trafficking in intoxicating liquor is insufficient. That was decided in *People* v. *Cook* (220 App. Div. 110; affd., 248 N. Y. 597.)

In its opinion in that case the Appellate Division pointed out: "At most, the defendant sold intoxicating

liquor to some of his friends and acquaintances in his own home, in the presence of other people. It was stipulated on the argument in this court that no disturbance was created, and that the outside public was not annoyed, or even aware of what was going on in appellant's home." The stipulation left open only the question whether sales made privately on a single day by a man in his own home to his own friends and acquaintances, without disorder, and resulting in no disturbance or annoyance to others, constituted an offense against public decency and a public nuisance. In the case which we are now called upon to decide, the question is whether the maintenance of premises for the purpose of trafficking in intoxicating liquor, a saloon or tippling house, conducted without sanction of or regulation by the State and in violation of the law of the land, may constitute a public nuisance under the Penal Law of this State. No such question was before the court in *People* v. *Cook* (*supra*).

" It is a public nuisance at common law to keep a house, room, or other place of such a kind, or in such a manner, as to cause disorder or scandal." (Russell on Crimes & Misdemeanors [7th ed.], p. 1887.) Brothels and common gaming houses have been classed as disorderly houses and public nuisances, because they were maintained for purposes which in themselves tended to cause disorder or scandal. Other kinds of houses became public nuisances only if they were conducted " in such a manner, as to cause disorder or scandal." " It is clearly agreed that keeping a bawdy house is a common nuisance, as it endangers the publick Peace by drawing together dissolute and debauched Persons; and also has an apparent Tendency to corrupt the Manners of both Sexes by such an open Profession of Lewdness. * * * It is clearly agreed that all common Gambling Houses are Nusances in the Eye of the Law, being detrimental to the Publick, as they promote Cheating and other corrupt Practices, and incite, to Idleness and avaricious Ways of gaining Property, great

Numbers whose time might otherwise be employed for the general Good of the Community." (Bacon, "Abridgement of the Law," sub-tit. "Nusances.") "The keeping of a common bawdy or gambling house constitutes the house so kept a disorderly house and an indictable nuisance at common law * * *. It is a public offense, for the reason that its direct tendency is to debauch and corrupt the public morals, to encourage idle and dissolute habits and to disturb the public peace. It is not an essential element that it should be so kept that the neighborhood is disturbed by the noise, or that the immoral practices should be open to public observation. The law, it is true, gives a remedy by indictment against those who unduly disturb the quiet of the community by noises which tend to impair the enjoyment of life, but it does not refuse cognizance of those far greater public injuries, which arise from practices which destroy the peace of families and disturb and undermine the foundations of social order and virtue." ( *King* v. *People of the State of New York*, 83 N. Y. 587, per ANDREWS, J.)

There are those who urge that all inns, ale-houses and other places where more or less intoxicating drinks are offered to the public for consumption, tend by reason of the kind of traffic conducted therein; like common gaming houses, to debauch the public morals and disturb the public peace, and should properly be classed with gaming houses as public nuisances. (*State ex rel. Vance v. Crawford*, 28 Kan. 726 at p. 733.) Danger to the public in an unregulated traffic in drink was early recognized in England. The State might meet the threatened danger by regulating or suppressing the traffic. It chose the less drastic course, and sanctioned the maintenance of drinking-houses only so long as they were conducted in an orderly manner and in accordance with the regulations of the Crown. Traffic in drink was lawful before the State recognized the need for regulation; it continued lawful thereafter when conducted with the express sanc-

tion of the State. A business which is lawful cannot be a nuisance when properly conducted. Ale-houses and other prototypes of the saloon were not nuisances at common law unless they became so because of the manner in which they were conducted. (*Rex* v. *Ivyes*, 2 Show. 468; *Stephens* v. *Watson*, 1 Salkeld, 45; *Faulkner's Case*, 1 Saunders, 248.)

Nevertheless it has long been the rule that public nuisances included not only bawdy-houses, common gaming houses and unlicensed shows, but also *disorderly* drinking places. "All disorderly inns or ale-houses, bawdy-houses, gaming-houses, stage-plays, unlicensed booths and stages for rope-dancers, mountebanks, and the like, are public nuisances, and may upon indictment be suppressed and fined." (4 Blackstone's Commentaries, p. 167.) So it was said in *Commonwealth* v. *McDonough* (95 Mass. 581): " Brothels and gaming-houses were held to be nuisances under all circumstances; but alehouses were not, unless they became disorderly." (See, also, *State* v. *Bertheol*, 6 Blackford [Ind.], 474; *Sopher* v. *State*, 169 Ind. 177.)

The question we must decide is whether the saloon or drinking place maintained by the defendant was " disorderly," as that term was understood by the judges and legal scholars who may be said to have directed the course of the common law. The Eighteenth Amendment to the Constitution created an entirely novel situation. It destroyed the choice of the State to sanction, regulate or prohibit traffic in intoxicating liquors. " The first section of the Amendment — the one embodying the prohibitions — is operative throughout the entire territorial limits of the United States, binds all legislative bodies, courts, public officers and individuals within those limits, and of its own force invalidates every legislative act — whether by Congress, by a state legislature, or by a territorial assembly — which authorizes or sanctions what the section prohibits." (*National Prohibition Cases*,

253 U. S. 350.) Each State might thereafter, for purposes of enforcement, declare that the prohibited acts constitute offenses against its own peace and dignity. None might make an act prohibited by the Constitution lawful. By its repeal of the State Enforcement Act, the Legislature of New York has determined that the public policy of the State does not require the State to embrace within its statutory definitions of crime the acts prohibited by the constitutional amendment. Certainly the courts may not create new categories of offenses against the State, or enlarge statutory definitions. None the less the courts must apply the accepted definitions of crime even in novel conditions, and determine whether in such conditions an offense against the State has been committed.

It may hardly be doubted that the Legislature did not intend that its definition of a public nuisance as " unlawfully doing an act * * * which act or omission * * * offends public decency * * * " (Penal Law, section 1530), should be confined to acts which are more or less analogous to the acts prohibited by article 106 of the Penal Law entitled " Indecency." The definition of a public nuisance contained in section 1530 is derived from section 385 of the Penal Code. That definition was originally formulated in the draft of a Penal Code prepared by Commissioners appointed in accordance with chapter 266 of the Laws of 1857. To the draft submitted to the Legislature the Commissioners appended a list of cases which in their opinion supported each statutory definition. As authority for their definition that a public nuisance included " unlawfully doing an act * * * which * * * offends public decency " the Commissioners cited only three cases, and the first case cited is *State* v. *Bertheol* (*supra*) which decided that at common law a disorderly alehouse or saloon constituted a public nuisance. In other jurisdictions which have adopted the same or similar statutory definitions, the courts have regarded the statute as merely declaratory of

the common law. (*Faucett* v. *Dewey Lumber Co.*, 82 Mont. 250; *Jones* v. *State*, 38 Oklahoma, 218.) Such construction seems implicit in the opinion of *People* v. *Hoffman* (118 App. Div. 862; affd., on opinion of the Appellate Division, 189 N. Y. 561. See, also, *Melker* v. *City of New York*, 190 N. Y. 481; *People* v. *Borden's Condensed Milk Co.*, 165 App. Div. 711, at p. 713; affd., 216 N. Y. 658). We conclude that while " for time out of mind the term ' nuisance ' has been regarded as incapable of definition so as to fit all cases, because the controlling facts are seldom alike " (*Melker* v. *City of New York, supra*), yet the public decency may be offended and a nuisance created by " practises which destroy the peace of families and disturb and undermine the foundations of social order and virtue." (*King* v. *People, supra.*)

We need not now attempt to decide whether in all cases such practices constitute a public nuisance. Doubtless an unrestricted judicial power to punish as a public nuisance all practices which in the opinion of the courts corrupt the public morals or disturb the public peace might create a danger of judicial invasion of the legislative field, through the creation of new crimes by the courts. Perhaps the power must be restricted to practices which are in true sense analogous to those which have been held to constitute common-law nuisances. At least for the purposes of this case, we shall assume that our power is so restricted. To determine whether the defendant's clandestine maintenance of an unlawful drinking place was " disorderly " and " offends public decency," we apply to new conditions the tests which have been approved and applied in the past.

The maintenance of a brothel was, as we have pointed out, a nuisance at common law, and it was punished as such by the courts of common law though the acts committed therein were offenses cognizable only by the spiritual courts. (*Galizard* v. *Rigault*, 2 Salkeld, 551.)

The maintenance of a common gaming house was a nuisance and punishable as such though the common law did not prohibit the playing at dice and cards. (*Jenks* v. *Turpin*, 13 Q. B. D. 505.) They were nuisances, not because they were maintained for purposes which violated the law, nor because they caused noise or disorder or resulted naturally in bringing together criminals and disorderly characters. They were nuisances and their maintenance constituted a public offense " for the reason that its direct tendency is to debauch and corrupt the public morals, to encourage idle and dissolute habits and to disturb the public peace." That is the test which has been applied for centuries and has been approved by this court. (*King* v. *People, supra.*) Measured by that test brothels and gaming houses are declared to be nuisances because disorder and evil are inherent in their nature, and drinking houses may be declared to be nuisances, even though authorized by law, when they are maintained in such manner as to produce similar evils and disorder.

It has been held that a " practise of so keeping a house as therein to violate the law makes it disorderly." (*State* v. *Williams*, 30 N. J. Law, 102; *Smith* v. *Commonwealth*, 45 Kentucky, 21; *Wilson* v. *Commonwealth*, 51 Kentucky, 2; *Meyer* v. *State*, 42 N. J. Law, 145; *Walt* v. *People*, 46 Colorado, 136; *People* v. *Hoffman*, 189 N. Y. 561; *People* v. *Curtis*, 152 App. Div. 372; affd., 206 N. Y. 747; *People* v. *Kingston*, 177 App. Div. 376. See, also, 1 Bishop, Criminal Law, 824; *Rex* v. *MacDonald*, 3 Burrows, 1645.)

It is not easy to define the exact limits of the doctrine of these cases. Perhaps that doctrine should be applied only where the defendant carries on a vocation which at common law has been regarded as a nuisance when carried on in a disorderly or ill-governed way. Perhaps other limitation may hereafter be formulated. At least it has been applied to saloons or drinking places where

traffic in intoxicating liquor is carried on in a manner prohibited by law. (*State* v. *Williams, supra; Meyer* v. *State, supra; Walt* v. *People, supra.*)

In those cases, it is true, the acts which gave color of disorder to the maintenance of the house were violations of the law of the State which declared the house a nuisance. Here, as we have pointed out, traffic in intoxicating liquor constitutes no offense to the peace and dignity of the State. The distinction is only superficial. The basis of the decision in these cases is that the maintenance of a house, where unlawful or vicious acts are habitual, tends to debauch public morals and to offend public decency, and constitutes a crime against the State independent of any crime which may be committed by each separate act done in the house. The State punishes the offense of inducing vice, rather than the vice itself; the indecency of such inducement — the injury to the public morals — constitutes the gist of the offense.

We recognize that the repeal of the State Enforcement Act has been sometimes regarded as a legislative declaration that the policy of the National Enforcement Act is not in accord with the public policy of the State. Doubtless there are many citizens who regard the Eighteenth Amendment as wrong in principle and pernicious in practice. Men may differ as to whether it has brought more evil than good. At least all must agree that the effect of the amendment as interpreted by the Supreme Court is to curtail the sovereignty of the State so that the State can no longer sanction, render lawful or regulate the traffic in intoxicating liquors. The injury to the State resulting from an unlawful and unregulated traffic in intoxicating liquor is unfortunately manifest. Difference of opinion exists only upon the question of whether the remedy lies in an attempt to enforce prohibition by the State or whether a State enforcement act would bring in its train greater evils. The Legislature has spoken upon that question. It has established the policy that

the State should not exercise its concurrent power to enforce prohibition created by the Constitution. It has certainly not attempted to declare that the State is not injured by the evils inherent in the illicit maintenance of saloons or so-called "speak-easies" in defiance or disregard of the law imposed upon the People of the State by constitutional amendment or act of Congress.

We might assume that opposition to the prohibition amendment and the National act adopted for its enforcement is in full measure justified; yet even then we could not blind our eyes to the harmful purpose and consequences of the maintenance of a saloon under the conditions created by National prohibition, which are so manifest that it would be an idle task to point them out. Opponents and supporters of prohibition are alike vociferous in their alarm over the debauchery of morals, the injury to health, the disturbance of the peace of the State which flow from the maintenance of illicit drinking places. None can doubt that from their nature such drinking places constitute an injury to the State.

We are not now concerned with distinctions concerning the sovereignty of State and Nation. The State does not authorize what the Nation forbids, nor does it seek to punish an offense against the peace and dignity of the Nation as if it were an offense against its own peace. It demands punishment for and suppression of the maintenance of premises for purposes which result in injury to the health and morals of the community and threaten to "undermine the foundations of social order and virtue." Even if the maintenance of an orderly drinking place were sanctioned by the State, a drinking place so conducted as to create such evils would under well-established authority constitute a public nuisance and an offense against the State.

The National Prohibition Act enacted by Congress could not and did not enlarge the definition of the crime of maintaining a public nuisance as defined by the Legis-

lature of this State. We give the National Prohibition Act no such effect. The National Prohibition Act has, however, changed the conditions under which drinking places may be and, in fact, are conducted. Before that act became part of the law of the land, saloons might be conducted in this State under the sanction of our law in an orderly manner, furnishing to their patrons liquor which might be bought in the open market and which was subject to reasonable regulation and inspection by public officers, calculated to safeguard the public health. Since that act has become the law of the land, drinking places must be conducted in fear of the law, withdrawn from inspection of public officers, furnishing liquor obtained, and perhaps manufactured, surreptitiously. We cannot close our eyes to facts which are manifest to all. Public approval or disapproval of the policy of pro-hibition, even the fiat of the Legislature, cannot change those facts. We know that liquor not subject to inspection, manufactured and sold surreptitiously, is a danger to health. We know that a drinking place, conducted surreptitiously, in fear of the officers of the law, not only tends to breed disrespect of all law, but attracts men of criminal character who might not dare to enter a place of entertainment conducted openly and subject to visitation by the police. We know that such places ruin the health of those they entice, induce idleness and dissolute habits, foster crime and thus cause injury to the public health and debauchery of the public morals.

We are not now concerned with the source of the law which has changed former conditions. We do not seek to enforce that law. We recognize the conditions now existing, regardless of the source from which they flow. We apply to the conditions now existing the definition of a public nuisance applied of old by the common law. The maintenance of a drinking place which produces such evils has never been an innocent act. It can hardly be doubted that such a drinking place has always been

"disorderly" and a "public nuisance" at common law and under the statutory definition of the Penal Law of this State, read in the light of the common law. Application of the statutory definition of a public nuisance to a drinking place conducted under conditions created by the National Prohibition Act, in no manner involves a holding that in effect Congress can amend the law of the State of New York. Indeed, it might more accurately be said that the act of Congress has amended the law of our State if we refuse to apply the statutory definition to conditions, which fairly come within its scope, merely because the act of Congress prohibits all drinking places, orderly or otherwise.

We determine only that an illicit common drinking house creates such evils. The harm to the community which arises from the defendant's act is hardly affected by distinctions drawn by constitutional lawyers as to the nature or source of the law which is habitually violated in the defendant's premises. Our conclusion that an illicit drinking place, from its nature, is a public nuisance which entices and induces men to break the law of the land and which tends to injure the health and morals of the community, is founded upon manifest conditions. It is the disorderly character of the illicit drinking place which constitutes the offense to the public decency. That offense arises from the nature of the acts habitually done upon the premises and the injury to the morals and health of the community which must naturally flow therefrom, apart from the annoyance or disturbance of those persons who might be in the neighborhood. We do not now consider whether the same conclusion would follow merely from proof that a person maintains premises in which other laws, either of State or of Nation, are habitually violated.

It has been urged that there can be no offense to public decency, and public nuisance unless the general public is invited to the premises, or at least aware of the purpose

for which they are used. The argument is specious. The defendant regularly used his premises for the purpose of selling strong drink to such part of the public as he chose to invite or admit, though the evidence shows that the business was conducted in a clandestine manner and that none were admitted to its allurements unless known to the defendant. Perhaps even without such evidence we might almost assume that the place was conducted clandestinely, and that not all the public knew of the place or were invited to it. Disrespect of the law has not yet generally assumed the aspect of open defiance. Habitual violations of the law are ordinarily conducted with some degree of secrecy. Otherwise they might not remain unsuppressed long enough to become habitual.

Open defiance of the law might perhaps accentuate the disorderly character of the premises, yet inducement to violate the law clandestinely results in scarcely less injury to the community. Brothels and common gaming houses seldom if ever invited the general public, yet as we have pointed out, they have always been punished as public nuisances. "To no gaming-house is the public at large invited to go without restriction of some sort or other. The keeper of such a house has always the right to admit or refuse admission to any one he pleases, or to make such rules as he may think fit for the regulation of such admission. * * * The law does not require that it shall be a public gaming-house: a common gaming-house is that which is forbidden, that is; a house in which a large number of persons are invited habitually to congregate for the purpose of gaming." (*Jenks* v. *Turpin, supra.*)

So here, the defendant's offense consists neither in annoyance nor disturbance of the public, but in maintaining a common drinking place in a disorderly manner. The disorder might be concealed from part of the public. The defendant might exclude such part of the public as he saw fit, but the premises were maintained for the

defendant's profit derived from inducing and enticing such part of the public as defendant did admit, to violate the National Prohibition Law clandestinely and to drink the prohibited beverage. The injury to the health and morals of the communtity constitues an offense against the peace and order of the State and a common nuisance as understood at common law and as defined by section 1530 of the Penal Law of this State.

The judgment of conviction should be affirmed.

POUND, J. (concurring). I concur.

"This Constitution * * * shall be the supreme Law of the Land." (U. S. Const. art. VI, § 2.) The Constitution is a part of the law of the State of New York. (*Hauenstein* v. *Lynham*, 100 U. S. 483, 490.)

The Eighteenth Amendment prohibits the sale of intoxicating liquors for beverage purposes. The purpose of the amendment is the protection of the public health, order, decency and morals. Every place where intoxicating liquor is openly and habitually sold is maintained in defiance of the United States Constitution — "the supreme Law of the Land."

Whatever may be said about the liquor traffic prior to the adoption of the Eighteenth Amendment, a place where intoxicating liquor is thus sold is now placed by the Constitution in the same class with bawdy houses and gaming houses, as being *per se* unlawful, subversive of public order, decency and morals to the annoyance of the People of the State of New York (Penal Law, § 1530) as well as of the United States of America. (U. S. Code, title 27, § 33.)

The State of New York does not aid in the enforcement of the Eighteenth Amendment by general legislation directed to that end but it should not refrain from upholding the Constitution by enforcing its existing laws when applicable to the situation.

The judgment should be affirmed.

CRANE, J. (concurring). I concur. Section 1530 of the Penal Law defines a public nuisance as an unlawful act which endangers the health of any considerable number of persons. The maintenance of a " speak-easy " or saloon for the sale of intoxicating liquors is the doing of an act which endangers the health of persons taking or buying the liquor.

The only justification for the Eighteenth Amendment and the National Prohibition Act is that intoxicating liquors are injurious to health. For this reason their sale has been prohibited. This was the point in *Lambert* v. *Yellowley* (272 U. S. 581), where the reports of the various medical societies upon this subject were considered of sufficient importance to be quoted. The deaths and the blindness from wood alcohol or poisoned liquor sold in these " speak-easies " have been too frequent to escape public attention and notice. As paradoxical as it may seem, the illegality and secrecy of such sales afford some protection to the violator of the law. It does not do to say that the place in which he violates the law is not a nuisance because the secrecy creates no noise. The danger to the frequenters of such a place, though health be sapped in silence, nevertheless makes the place a nuisance. The law does not inquire whether the liquor be good or bad; it takes no chances.

The maintenance of this " speak-easy," therefore, in my judgment, comes directly within this definition of our Penal Law of a public nuisance.

ANDREWS, J. (concurring). With the result reached in this case I agree. " A ' public nuisance ' is a crime against the order and economy of the State, and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission: 1. Annoys, injures or endangers the comfort, repose, health or safety of any considerable number of persons; or, 2. Offends public decency; * * * or, 4. In any way renders a considerable number of persons

insecure in life, or the use of property." It is not necessary that the public be invited to the building upon which the nuisance is said to be maintained. It is enough if any considerable number are accustomed to enter and disorder customarily follows.

Here there is proof that persons became intoxicated upon the premises and left them, still intoxicated, school children and others being in the neighborhood. Under such circumstances the defendant maintained a disorderly house within every reasonable definition and so comes within the first and second subdivisions of the statute.

I am unwilling to go further. Doubtless if the defendant dispensed poisonous or adulterated liquor, he endangered the health of many. (*People* v. *Kingston,* 177 App. Div. 376.) Of that there is no proof. We certainly may not hold, as a matter of judicial knowledge, that the moderate consumption of pure beer, wine or spirits is dangerous. Too many eminent physicians take the other view. Nor do epithets supply the want of evidence.

Neither do I think that the maintenance of premises for practices not in themselves immoral or disorderly although prohibited by statute, is an offense against public decency. The so-called Volstead Act is no more sacred than other statutes authorized by the Constitution. Its habitual violation is no more an offense against the decency, or the order of this State, than would be the habitual grant of rebates by railroad corporations. To so hold where there is no actual disorder would be to subject the defendant to that same double jeopardy which was one of the reasons for the repeal of the Mullan-Gage Act.

If mere disobedience to some statute is not sufficient, then there must be something peculiar in the possession and sale of liquor to bring it within the thought of the Legislature. It must be immoral *per se.* Such sales have long been regulated. One object was revenue for the

State, easily collected, as was the case with tobacco. Another was to check public disorder. We all know the indignation caused by the persistent and notorious breach of these regulations. We know the evil influence of saloons in politics — the poverty and violence that resulted. Conducted as they were and given the frailty of human nature they were as a whole an undoubted evil. Ill repute fell on innocent and guilty alike. Also, even if no drunkenness or disorder were permitted, they were a temptation to extravagance, to neglect of thrift — as are today a cigar store or an automobile salesroom.

Yet under the guise of enforcing a penal statute courts should beware of attempting to give effect to their own notions of right or wrong, of wisdom and policy. They are to declare that criminal only when the Legislature has made it a crime. New conditions may point to new needs. It is for the Legislature to act. The courts are to interpret its words — not to extend its meaning to situations as to, which it had no thought. And in so doing they may not consider this particular section of the Penal Law as if it were a venture into a new and untried field. They are to view it in the light of its historic background. The Legislature spoke of " public decency," having before it many decisions and a long tradition.

Neither the Legislature nor the Commissioners who drafted this section of the statute in 1857 thought the mere possession and consequently the sale of liquor a thing immoral in itself — a sin. If for other reasons a saloon became disorderly, yes. Then there was an independent crime. Not otherwise. If a saloon were unlicensed, the sale was forbidden. But never was it held that such disobedience was also an offense against decency. In that day the thought that the moderate use of liquor was a wrong occurred to few. Such an idea seems never to have been in the mind of Moses if we have received the substance of his words (Deuteronomy, XIV: 23). Nor did it occur to St. Paul (1 Corinthians, XI:

25; 1 Timothy, V: 23), to St. Augustine (St. Augustine, book. 10, chap. 31), to Luther (Bayne, Luther, vol. 2, p. 243), nor to Jonathan Edwards (Works, vol. 1, p. 70). It is not yet the belief of England, France, Italy or Quebec. Nor of our own citizens on a British steamer with New York a hundred miles behind. To impute to our Legislature any such belief is an anachronism. It itself authorized possession and sale. It drew a large revenue from the traffic. The people of the State approved. We pay slight respect to our predecessors if we ascribe to them a thought that the orderly sale in itself offended public decency or the order and economy of the State.

The Legislature gave some indication of the kind of thing it understood by the word " indecent " in definitions contained in another article. Clearly in using words subject to wide interpretation, it had in mind the meaning given them in the past. Brothels, houses of abortion were evil in themselves. So, to a lesser extent, were public gaming houses. As to them courts might well say that their direct tendency was to debauch public morals and to disturb the public peace. Such general statements should not, however, be disassociated from their context. Never before, in England or New York, have they been applied to the orderly sale of liquor, permitted or unpermitted. And when the Legislature spoke of public decency it did not, any more than would one who reads the statute, suppose it had reference to such sales. Nor did it suppose that the habitual possession of wine in a private house, where freely offered to guests, was an indecent act.

What has happened since the section was adopted to make a crime of that which was not a crime before? Concededly any sale of liquors is now unlawful. Concededly the Volstead Act is the rule of New York as well as the rule of Kansas. Yet its violation does not offend the order and economy of the State, unless the violation of any statute does so because such violation might

corrupt the public morals. Such wide latitude to the term is inadmissible.

We disapprove of the possession and sale of liquor, as we do of disobedience of any statute, State or National. But because we disapprove, we should not declare criminal what was never so intended by the Legislature. We should remember what was in its mind when the section was adopted. We should limit our declarations as to what constitutes public decency to acts strictly analogous to those with which the courts had hitherto dealt.

This discussion is not necessary for the decision of the case before us, as the discussion in the prevailing opinion is not. Always a disorderly drinking place has been declared a public nuisance; here disorder was shown. For that, I repeat, the present defendant may be punished under our statute.

CARDOZO, Ch. J., POUND, CRANE and O'BRIEN, JJ., concur; POUND and CRANE, JJ., in separate opinions; ANDREWS, J., concurs in result in opinion in which KELLOGG, J., concurs.

Judgment affirmed.